J-S02001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.I.D., A MINOR | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.C., MOTHER | : | No. 2735 EDA 2017 |

Appeal from the Decree August 9, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0001127-2016,
CP-51-DP-0001433-2015

BEFORE:   BOWES, J., NICHOLS, J., and RANSOM*, J.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 16, 2018**

A.C. ("Mother") appeals from the August 9, 2017 decree that involuntarily terminated her parental rights to her minor daughter, N.I.D., born in May 2013.[1]  We affirm.

The Philadelphia Department of Human Services ("DHS") first became involved with N.I.D. in April 2015, based on concerns that Mother was engaging in drug use and neglecting N.I.D.'s medical needs.  Mother suffered from mental health issues, and she had a history of engaging in domestic

---

* Retired Senior Judge assigned to the Superior Court.

[1] The trial court continued the involuntarily termination proceedings as to N.I.D.'s father, J.D. ("Father").  Although the certified record does not reveal whether the court ultimately terminated Father's parental rights, the result of those proceedings is irrelevant to our review herein.  ***See In re Burns***, 379 A.2d 535, 541 (Pa.1977) ("When an agency having custody of a child petitions for termination of parental rights, the rights of the respective natural parents must be determined independently.").

violence with Father, who was a convicted child sex offender. DHS obtained protective custody of N.I.D. on May 29, 2015, after Mother's homeless shelter evicted her for threatening a staff member. The trial court entered a shelter care order on June 1, 2015, and it adjudicated N.I.D. dependent on June 16, 2015. The court placed N.I.D. in kinship care with the maternal grandmother, whom N.I.D. refers to as "mommy." While the initial permanency goal was reunification, she remains in her grandmother's and grandfather's care.

Following N.I.D.'s adjudication of dependency, APM,[2] the Community Umbrella Agency ("CUA") that administered the family services for DHS, prepared a Single Case Plan ("SCP") for Mother. Mother's SCP objectives were to: (1) sign releases of information for service providers; (2) provide CUA with updated contact information; (3) attend a Clinical Evaluation Unit ("CEU") referral for a dual diagnosis assessment and drug screens; (4) comply with CEU recommendations; (5) follow medication management recommendations; (6) continue weekly therapy; (7) attend weekly sessions of supervised visitation with N.I.D.; (8) complete parenting classes; and (9) locate appropriate housing.

For the ensuing eighteen months, Mother made minimal progress toward her SCP objectives. She participated in a dual diagnosis assessment

---

[2] APM (*Asociación Puertorriqueños en Marcha*) "is a community-based agency that is responsible to improve the safety, stability, and well-being of the children and families in the 24th and 26th police districts through Philadelphia's Department of Human Services (DHS)." **See** https://apmphila.org/services/family-services/community-umbrella-agency-apm-cua/

and compiled with CEU's recommendation to attend intensive outpatient treatment, but she exhibited little motivation to overcome her substance abuse issues. In fact, during 2016, Mother submitted positive drug screens for marijuana and oxycodone. In regard to her mental health, Mother attended only two of seventeen mental health treatment sessions. Likewise, she failed to complete a parenting program, remained without stable housing, and inconsistently attended the weekly one-hour visitations with N.I.D.

On November 21, 2016, DHS filed a petition to involuntarily terminate Mother's parental rights to N.I.D. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The trial court conducted a termination hearing on August 9, 2017, during which it heard the testimony of the CUA case manager assigned to the family, Crystal Robinson, and Mother.[3] Following the hearing, the court entered a decree terminating Mother's parental rights. Mother timely filed a notice of appeal on August 24, 2017, along with a concise statement of errors complained of on appeal.

Mother raises the following issues for our review.

1. Did the Trial Court err in terminating [Mother's] parental rights under 23 Pa.C.S. [§] 2511(a)[?]

---

[3] The trial court appointed Joshua Weil, Esquire, to represent N.I.D.'s legal interests. Her best interest was represented by the guardian *ad litem*, Ruth Brice, Esquire. Neither attorney filed a brief in this appeal.

2. Did the Trial Court err in finding that termination of parental rights best served the child's developmental, physical and emotional needs under Pa.C.S. [§] 2511(b)?

3. Did the Trial Court err in changing the child's goal to adoption?

Mother's brief at vi.[4]

We consider Mother's issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

---

[4] In her notice of appeal, concise statement, and brief, Mother indicates that she is appealing both the termination of her parental rights and the trial court's decision to change N.I.D.'s permanent placement goal to adoption. In its opinion, the trial court requests that we affirm its August 9, 2017 goal change order. However, our review of the certified record confirms that no goal change took place. The court did not indicate at the conclusion of the termination hearing that it would be changing N.I.D.'s goal, and the court's August 9, 2017 permanency review order maintained N.I.D.'s goal as return to parent or guardian. As the goal change is not a prerequisite to the termination of parental rights, we address only the termination of Mother's parental rights. *See In Re: Adoption of S.E.G.*, 901 A.2d 1017 (Pa. 2006) (goal change is not condition precedent to termination of parental rights).

Termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of § 2511(a), as well as § 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under § 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity,

> abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>    . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to § 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).

It is a well-ensconced principle that "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002) (citations omitted).

Presently, the trial court concluded that Mother was incapable of parenting N.I.D., and that she cannot, or will not, remedy her parental incapacity, and that her "eleventh-hour attempt to . . . make it appear as if she's remedying some of the issues" was unconvincing. Trial Court Opinion, 10/26/17, at 14-15; N.T., 8/9/17, at 45. Specifically, the court determined that the CUA case manager, Crystal Robinson, credibly testified that Mother failed to comply with her SCP objectives. *Id*. at 15.

Mother counters that she demonstrated moderate compliance. She contends that she was attending mental health and substance abuse treatment, and making progress in both areas when DHS filed its petition to terminate her parental rights. Mother's brief at 3. Mother also contends that she was searching for housing and attending visitation with N.I.D. *Id*.

The certified record supports the trial court's findings. During the termination hearing, Ms. Robinson testified that Mother's substance abuse issues remained unresolved. Ms. Robinson recalled that she spoke to Mother in June 2017, and that Mother admitted that she was no longer attending a substance abuse treatment program. N.T., 8/9/17, at 22. In addition, Mother admitted that she was using Percocet to self-medicate her depression. *Id*. at 21-22. While Mother eventually re-enrolled in substance abuse treatment, she did not do so until July 26, 2017. *Id*. at 31-32.

Mother's mental health issues also continued to be a concern. Ms. Robinson testified that, on the day of the termination hearing, Mother provided her with a document indicating that she began attending mental health

treatment at Best Behavioral Health during January 2017. *Id*. at 31. However, Ms. Robinson stressed that she had not yet had time to contact the facility and verify the consistency of Mother's attendance. *Id*.

In addition, Ms. Robinson testified that Mother had not completed a parenting program. *Id*. at 32. In fact, the record is replete with examples of Mother's parenting deficiencies. For instance, Ms. Robinson described a particularly troubling event that occurred at supervised visitation when Mother claims that she was progressing toward her goals. *Id*. at 23. Ms. Robinson recalled that Mother "came [to] the visit dressed [in]appropriately . . . [a]nd when staff asked her to leave, to cancel her visit, she became irate. [She s]tarted yelling and cursing and threatening staff in the presence of her child." *Id*. at 23-24. N.I.D. began to cry and staff had to escort her away. *Id*. at 24. This conduct belies the image of the caring parent that Mother attempts to project.

Mother also remained without appropriate housing. *Id*. at 25. Indeed, Mother reported to CUA that she "lives in a room," but she neglected to provide the street address. *Id*. at 23. Finally, Mother's attendance at visitations with N.I.D. continued to be inconsistent. *Id*. Mother attended visitation sporadically during May and June 2017, and in the month preceding the August 2017 termination hearing, Mother participated in only one supervised visitation with her daughter. *Id*. at 24.

Thus, the record confirms that Mother is incapable of parenting N.I.D., and that she cannot, or will not, remedy her parental incapacity. By the date

of the termination hearing, N.I.D. had been in foster care for over two years. During that time, Mother did little to comply with her SCP objectives and work toward reunification. While Mother re-enrolled in substance abuse and mental health treatment in 2017, those efforts were insufficient. It is well-settled that "a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **A.L.D.**, 797 A.2d at 340 (citing **In re J.W.**, 578 A.2d 952, 959 (Pa.Super. 2002)). As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa.Super. 2006). We find no basis to disturb the trial court's conclusion that DHS established the statutory grounds to terminate Mother's parental rights pursuant to § 2511(a)(2).

We next consider whether the trial court erred or abused its discretion by terminating Mother's parental rights pursuant to § 2511(b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis,

it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and

citations omitted).

The trial court concluded that terminating Mother's parental rights would best serve N.I.D.'s developmental, physical, and emotional needs and welfare. Again, the court found Ms. Robinson's testimony credible. Specifically, in relation to the lack of a meaningful parent-child bond, the court highlighted Ms. Robinson's testimony that N.I.D. established a primary bond with her maternal grandparents, whom she calls "mommy" and "tata." N.T., 8/9/17, 26. The court determined that N.I.D. does not have a meaningful bond with Mother, and that the termination of Mother's parental rights would not cause N.I.D. to suffer irreparable harm.

Mother argues that her visits with N.I.D. went well, and she challenges the trial court's finding that the bond she shares with N.I.D. was inconsequential. In support of her position, Mother invokes the aspects of Ms. Robinson's testimony that indicated that the visitations usually went "pretty

well," and that Mother and daughter shared some type of a bond. N.T., 8/9/17, at 32. Ms. Robinson recalled that there were "maybe one or two occasions where [N.I.D.] would cry because she didn't want the visit to be over." *Id*. at 33.

Our review of the certified record supports the trial court's findings. Consistent with the court's conclusions, the record demonstrates that, while the visitations that mother attended were uneventful, they did not illustrate a meaningful mother-daughter relationship. The most compelling expression of this reality is that, if N.I.D. acknowledged Mother at all during the visitations, the four year old referred to Mother by her first name. *Id*. at 32. Thus, rather than evince any of the hallmarks of a meaningful parent-child bond, N.I.D.'s behavior indicated that she viewed Mother as a playmate.

In contrast to the tenuous connection that Ms. Robinson observed between N.I.D. and Mother, she testified that N.I.D. has "a very healthy bond and attachment" with her maternal grandparents, with whom she has resided since June 2015, when she was two years old. *Id*. at 26. She characterized the home as loving, nurturing, and safe. *Id*. Significantly, Ms. Robinson opined that N.I.D. views her grandparents "in a parental role," and as we previously noted, the four-year-old child refers to them as "mommy," and "tata." *Id*. Thus, it is evident that N.I.D.'s primary parental bond is with her maternal grandparents.

Mindful that a trial court can "consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent"

- 11 -

and "the importance of continuity of [those] relationships[,]" we find sufficient evidence in the certified record to sustain the trial court's determination. ***See In re Adoption of C.D.R.***, ***supra*** at 1219. Stated plainly, it was within the trial court's discretion to conclude that terminating Mother's parental rights in order for N.I.D. to attain permanency with maternal grandparents satisfied the child's developmental, emotional, and physical needs and welfare.

Accordingly, for all of the foregoing reasons, we affirm the decree involuntarily terminating Mother's parental rights to N.I.D. pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/16/18